IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 17–16–BU–DLC |
| Plaintiff, | |
| vs. | ORDER |
| BENJAMIN CALVIN BROOKS, | |
| Defendant. | |

Before the Court is Defendant Benjamin Calvin Brooks' ("Brooks") Motion to Suppress. (Doc. 28.) On December 21, 2017, the Court held an evidentiary hearing on the motion and heard testimony from Montana Highway Patrol Trooper Brandon Paul Moore ("Trooper Moore") and arguments from counsel.[1] Prior to the hearing, the Court reviewed all of the evidence filed by counsel, which included the video tapes of the traffic stop.

Brooks contends that the results of the search of his vehicle must be suppressed because (1) his Fourth Amendment rights were violated when Trooper

---

[1] On January 2, 2018, the Court also received a letter from Brooks containing both additional evidence and legal argument. (Doc. 43.) To the extent that the letter is evidence, it is not being considered by the Court because it is unsworn testimony and the Government did not have the opportunity to cross examine.

Moore removed Brooks from his vehicle in a threatening manner, and (2) Trooper Moore prolonged the traffic "mission" by launching a separate criminal investigation. In response, the Government argues (1) that Brooks was not seized during the traffic stop, and thus no *Miranda* warning was required, and (2) that Trooper Moore's secondary investigation was permissible because it did not prolong the traffic stop, or, alternatively, that Trooper Moore had an independent reasonable suspicion to prolong the stop.

For the reasons discussed below, the Court denies the motion.

### FACTUAL BACKGROUND

On July 31, 2017, at approximately 8:15 a.m., Trooper Moore was patrolling U.S. Highway 191 in Gallatin County when he observed a black sedan make an illegal pass around a Montana Department of Transportation vehicle. Trooper Moore activated his lights and observed the sedan take a left-hand turn off the highway into a newly developed subdivision. Instead of stopping, the vehicle then turned right and continued approximately one hundred feet up the road, finally parking alongside a mound of topsoil.

As Trooper Moore approached the vehicle, he observed the driver make what he described as gross movements, which Trooper Moore believed was inconsistent with someone retrieving a license and registration. Trooper Moore

-2-

called out to the vehicle's driver to roll down the window, but the driver did not and the movements continued. Trooper Moore delayed his approach and again called out to the driver to place his hands on the steering wheel. Trooper Moore then observed the driver—a middle-aged black male—comply with his request. Trooper Moore cautiously continued his approach with his right hand was resting on his belt holster. Again, Trooper Moore asked the driver to roll down the window. The driver rolled the window down a few inches. Trooper Moore repeated his request. The driver then rolled the window down incrementally more and asked how far down the Trooper wanted it, to which Trooper Moore responded, "Hey buddy, I'm not interested." (Doc. 29 at 5.)

Trooper Moore then asked for the standard paper work. After multiple requests, the driver complied, but appeared to shield the center console from view. This caused Trooper Moore to believe that the driver was potentially concealing a weapon. Trooper Moore used his flashlight to peer into the vehicle, looking for weapons. Trooper Moore asked the driver multiple times whether the driver had a weapon on him, to which the driver stated that he did not. After retrieving the appropriate paper work, Trooper Moore placed it on the roof of the vehicle and asked the driver to step out. The driver got out of the car carefully, reaching his hands out in front of him and stated that he did not want to get shot. Trooper

Moore responded that no one was getting shot. As the driver exited, he spun in a circle. Trooper Moore stated that the driver was making him nervous and instructed the driver to wait at the trunk of the car. Trooper Moore then briefly conducted a visual inspection of the vehicle, at which point he observed what appeared to be a spent shell casing on the floor near the drivers' side door.

Walking back to the rear of the vehicle, Trooper Moore asked the driver to lace his fingers behind his back, while he patted the driver down for a weapon. Finding none, Trooper Moore visibly calmed in demeanor and asked the driver to return to the patrol car while Trooper Moore issued the traffic citation. At this time he learned that the driver's name was Benjamin Calvin Brooks.

During the conversation in the patrol car that followed, Trooper Moore extensively questioned Brooks regarding his whereabouts, the rental vehicle, and where he was headed. He learned that Brooks was traveling from Arizona to Billings after attending his cousin's wedding. He also learned that the vehicle was a rental, procured by Brooks' wife, but that Brooks was traveling home alone. Based on inconsistencies in Brooks' recount of events, Trooper Moore circled back and asked Brooks for greater detail. Most notably, Brooks stated that he had left for the wedding the day prior to renting the car. This, coupled with the lack of visible luggage in the rental vehicle, the lived-in look of the car, and Trooper

Moore's knowledge and belief that Highway 191 is a drug trafficking corridor and that drug traffickers often use rental vehicles, Trooper Moore became suspicious that Brooks was transporting contraband. At some point during his questioning, Trooper Moore called for backup and initiated a secondary ex-felon background check, which is an addition to the standard registration and license checks.

Nearing the end of the questioning, Trooper Moore asked Brooks whether he had been in trouble before. Brooks confessed to having a felony conviction for burglary. However, he did not mention having a felony conviction for possession with intent to distribute, which Trooper Moore learned upon receipt of the ex-felon background check. Trooper Moore then completed the citation. The total time from when Brooks stepped into the patrol vehicle to the time when Trooper Moore finished the citation lasted approximately 18 minutes.

Stepping out of the patrol car, Trooper Moore met Brooks at the front of the vehicle to go over the citation, after which Trooper Moore told Brooks that he was free to go. Brooks took approximately eight steps towards his car before Trooper Moore asked whether Brooks would be willing to answer a few more questions. Brooks agreed, talked for a short period of time, but terminated the conversation when Trooper Moore asked Brooks how he would feel about getting a K9 unit to the scene to sniff for contraband. By this time Trooper Moore's partner had

arrived on scene. Brooks was told again by Trooper Moore that he was free to leave but was not free to take his vehicle. Brooks left the scene on foot. This second phase of voluntary questioning lasted approximately eight minutes.[2]

Based upon Brooks' inconsistent statements to Trooper Moore, the positive results of the K9 search, and the observation of a second spent shell casing near the trunk of the vehicle, Trooper Moore filed for and obtained a search warrant. The search yielded 615 grams of actual methamphetamine and a handgun.

Brooks challenges the constitutionality of the search and requests that all statements and evidence be suppressed.

## LEGAL STANDARD

In a motion to suppress the defendant bears the burden of proving a Fourth Amendment violation. *Rakas v. Illinois*, 439 U.S. 128, 130 n. 1 (1978) (citing *Simmons v. United States*, 390 U.S. 377, 389–390 (1968)). To rule in the defendants favor, the court must conclude that this burden has been met by a preponderance of the evidence. Fed. Rule of Evid. 104(a); *Bourjaily v. United States*, 483 U.S. 171, 174 (1987). Here, Brooks has the burden of proving that (1)

---

[2] Of these eight minutes, Trooper Moore engaged Brooks in further indepth questioning for approximately four minutes. In the remaining time, Brooks left the scene to urinate and then returned to question the Troopers as to why he could not leave in his car. After approximately eight minutes he left the scene.

his Fourth Amendment rights were violated, (2) the traffic stop was prolonged, and (3) the prolonged stop was not justified by an independent reasonable suspicion.

For the reasons discussed below the Court concludes that Brooks was not seized in violation of his Fourth Amendment rights and thus no *Miranda* warning was required. Furthermore, Trooper Moore had independent reasonable suspicion to prolong the traffic stop. Accordingly, the Court denies the Motion to Suppress.

## DISCUSSION

The Fourth Amendment to the United States Constitution provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV. "[A] person is seized only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall,* 446 U.S. 544, 553–554 (1980) (internal quotation marks omitted). Even a brief traffic stop is a seizure within the meaning of the Fourth Amendment, and therefore is subjective to the "constitutional imperative" that it be reasonable under the circumstances. *Whren v. United States*, 517 U.S. 806, 810 (1996); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002). However, the ordinary traffic stop does not typically involve a custodial term that requires a *Miranda*

warning. *Pennsylvania v. Bruder*, 488 U.S. 9, 10 (1988); *see also Berkemer v. McCarty*, 468 U.S. 420, 437–440 (1948) (finding that a person's detention and questioning during a traffic stop does not raise the concerns of coercion to the degree that *Miranda* warnings are required.) "[T]he usual traffic stop is more analogous to a so-called "Terry stop," . . . than to a formal arrest." *Berkemer*, 468 U.S. at 439 (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). Thus, the temporary seizure of the driver and passengers "ordinarily continues, and remains reasonable, for the duration of the stop," *Arizona v. Johnson*, 555 U.S. 323, 333 (2009), as measured by the time reasonably necessary to complete the traffic mission. *United States v. Evans*, 786 F.3d 779, 786 (9th Cir. 2015) (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). The traffic mission itself includes the ordinary tasks necessary to ensure that vehicles are operated safely and responsibility. *Evans*, 786 F.3d at 786.

## I.    Fourth Amendment Violation

Brooks concedes that Trooper Moore had probable cause to initiate the traffic stop when he witnessed Brooks use the turning lane to make an unlawful pass around a Department of Transportation vehicle. Because the initial stop was lawful, no *Miranda* warning was required for the duration reasonably necessary to complete the traffic mission. Rather, Brooks first argues that he was seized in

violation of his Fourth Amendment rights because Trooper Moore's threatening conduct constituted a de facto arrest. (Doc. 28 at 14.) Specifically, Brooks argues that he was in custody the moment Trooper Moore asked him to step out of the vehicle.

It is well settled that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." *Maryland v. Wilson*, 519 U.S. 408, 414 (1997). Thus, if the seizure became unlawful, it did not occur as the result of Trooper Moore escorting Brooks to the patrol vehicle to wait in the front seat while Trooper Moore issued the citation.

Though the general rule provides that a reasonable traffic stop does not require a *Miranda* warning, a traffic stop may raise coercive concerns requiring the full "panoply of protects proscribed by *Miranda*" if its manner renders an individual in custody. *United States v. Iturbe-Gonzalez*, 100 F.Supp. 3d 1030, 1037 (D. Mont. 2015), aff'd 2017 WL 2963532 (9th Cir. July 12, 2017) (quoting *Berkemer*, 468 U.S. at 440). These circumstances arise when an individual is subject to treatment that, under the totality of circumstances, would cause a reasonable person to believe an arrest has occurred. *United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001); *see also Iturbe-Gonzalez*, 100 F. Supp. 3d at 1037. Factors relevant to the determination include: "(1) the language used to

summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *Hayden*, 260 F.3d at 1066.

In support of the first factor, Brooks argues that Trooper Moore's language in summoning Brooks adds to the calculus because he spoke loudly and aggressively. The Court disagrees. The language and tone used by Trooper Moore was proportionate to the circumstances. As Trooper Moore approached the vehicle he called out to Brooks to roll down his window. When Brooks failed to comply, Trooper Moore called out again, this time asking Brooks to place his hands on the steering wheel. Trooper Moore did not move closer until he saw Brooks' hands. Thus, any added volume was necessary to communicate from a distance and through a closed window.

Additionally, Trooper Moore acknowledged in his police report that he was initially abrupt due to officer safety concerns. (Doc. 29-2.) Twice he asked Brooks to roll down the window, to which Brooks complied in part and asked how far down the window needed to be. In response, Trooper Moore stated, "Hey buddy, I'm not interested." (Doc. 28 at 5.) While perhaps callous, this language is not threatening nor aggressive. Accordingly, the Court concludes that the first

factor is not met.

Brooks concedes the second element, but in support of the third element asserts that his physical surroundings when he was questioned by a uniformed officer in a patrol car would cause any reasonable person to believe they were in custody. On the other hand, Trooper Moore testified that it was his usual practice to bring persons back to the patrol car. The salient factor here is that Brooks was asked to sit in the front passenger seat rather than the back seat of the patrol car, which is inconsistent with an arrest. Trooper Moore directed Brooks to the car, but did not open the door for Brooks or close it behind him. Brooks got into the car by his own volition. Accordingly, this factor does not weigh in Brooks' favor.

Brooks further argues that the duration of the detention constituted an arrest. However, given that Brooks argues that the moment of arrest occurred at the time he was asked to step out of the vehicle, within the first two and a half minutes of the stop, the Court disagrees that the duration of the detention weighs in Brooks favor. Nor was the duration of questioning once in the patrol car, which lasted approximately 18 minutes, clearly excessive. Trooper Moore testified that his standard practice when issuing a traffic citation is to be meticulous and careful to ensure the citation is correct. He also stated that he is not the fastest typer. The Court takes his testimony as true and finds no indication that he was intentionally

delaying the stop.

The period of voluntary questioning after Brooks was told he was free to leave was also relatively brief. It lasted only eight minutes, four of which were spent questioning Brooks and four of which were spent on unrelated activities. The entire encounter from start to finish lasted 33 minutes. The duration itself, though perhaps slightly prolonged for the purpose of issuing a ticket, does not in and of itself constitute a custody. Accordingly, the Court concludes this element is not met.

Lastly, Brooks argues that the degree of pressure involved in the stop constituted an arrest. This is perhaps Brooks' most compelling argument. Based on the totality of circumstances, Brooks claims that a reasonable person believes he or she is in custody when, during a traffic stop, (1) a uniformed officer, (2) resting a hand on his weapon, (3) asks an individual to hold the steering wheel, (4) while engaging the individual in investigative criminal questioning, and (5) instructing the individual to leave the vehicle and return to the patrol car. The pressure was such that Brooks feared for his safety and stated that he did not want to get shot. While the relevant determination is not what Brooks himself believed, but what a reasonable person in his position would have believed, the Court finds Brooks' behavior consistent with a reasonable level of intimidation. The patrol

car surveillance video corroborates that Brooks appeared fearful and intimidated at the beginning of the stop due to the pressure from Trooper Moore.

Even though this single factor tilts in Brooks' favor, the Court is unable to conclude that this alone, under *Hayden*, equates to being in custody. Notably, the reasonable person calculus is not easily divorced from the officer's legitimate safety concerns. When Trooper Moore approached the vehicle, he testified that his safety concerns were heightened because of the remote location and what he perceived as Brooks' unusual behavior. Trooper Moore stated that when he approached Brooks he was looking for verbal compliance. He instructed Brooks to roll down the window, and Brooks did so incrementally and reluctantly. Trooper Moore believed this was unusual, because in his opinion everyone rolls down their window. Rather than assuaging Trooper Moore's safety concerns, Brooks' conduct continued to increase Trooper Moore's apprehension. When Trooper Moore asked Brooks to exit the vehicle, Brooks spun in a circle. After Brooks exited the vehicle, he looked in the window and observed a shell casing between the door and drivers' seat, which presented a clear safety concern. Trooper Moore testified that he believed that Brooks was sizing him up. All of this caused Trooper Moore to tell Brooks that he was making him nervous. The traffic stop continued to cause mutual anxiety up until the time Trooper Moore

determined that Brooks did not have a weapon on his person after the pat down. Given the legitimate officer safety concerns that underlie Trooper Moore's behavior, and Brooks' participation in creating some of these concerns, the Court cannot conclude that the pressure of the traffic stop constituted a custodial term.

Thus, having weighed all factors, the Court determines that Trooper Moore's conduct did not constitute a de facto arrest requiring a *Miranda* warning.

## II. Prolonged Traffic Stop

Next, Brooks argues that the traffic stop violated his Fourth Amendment rights because the traffic stop immediately took on an aspect unrelated to the traffic mission, in activities such as Trooper Moore's calling for backup, asking detailed questions unrelated to the traffic mission, and conducting unrelated records checks. (Doc. 29 at 20.) The Court agrees with Brooks that soon after the traffic stop commenced there was an investigative aspect to Trooper Moore's questioning which overlapped with the tasks associated with the traffic stop. However, this on its own does not render the search unconstitutional. The proper inquiry is whether these extraneous activities either unlawfully prolonged the traffic mission, or were not supported by independent reasonable suspicion.

In *Rodriguez v. United States*, 135 S. Ct. 1609 (2015), the Supreme Court detailed the lawful scope of a traffic stop, explaining that "the tolerable duration of

police inquiries. . . is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Id.* at 1615–16 (internal citations omitted). However, "[a]n officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 1616. "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* In *United States v. Evans*, 786 F.3d 779, 786 (9th Cir. 2015) (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005), the Ninth Circuit concluded that running an ex-felon check or a canine search are tasks "wholly unrelated" to the traffic mission.

The issue then, is one of timing. If this Court concludes that police questioning or running the ex-felon background check prolonged the time reasonably necessary to complete the traffic mission, the secondary investigation must be supported by independent reasonable suspicion. Otherwise, Trooper Moore's failure to provide a *Miranda* warning requires suppression of evidence. *See United States v. Mendez*, 476 F.3d 1077, 1079–80 (9th Cir. 2007) (finding that officer questioning on matters unrelated to the initial stop does not violate the Fourth Amendment unless it prolongs the stop); *see also Evans*, 786 F.3d at 786

(finding that an officer may conduct activities unrelated to the traffic mission so long as it does not prolong the stop, unless supported by an independent reasonable suspicion.)

For support, Brooks relies on *Berkemer*, *supra*, 468 U.S. at 437, as authority that a traffic stop is presumptively a temporary and brief affair. He argues that the traffic stop was prolonged by Trooper Moore's criminal investigation because Trooper Moore necessarily had to stop issuing the citation in order to review the results from the ex-felon background check. He also argues that Trooper Moore delayed issuing the traffic citation while he waited for the results from the ex-felon check to come through, as evidenced by the fact Trooper Moore finished writing the ticket within a minute of receiving the results. The Government argues that the additional questioning and running the ex-felon check did not extend the traffic stop because these activities ran concurrently with Trooper Moore's writing the traffic citation. As for the delay in issuing the ticket itself, Trooper Moore attributes this to the complexity of a manual system with multiple tabs, requiring him to move within various screens to issue a ticket. Trooper Moore explains that any delay is the result of being meticulous and careful in his work.

In *Evans*, the Ninth Circuit found that the traffic stop was prolonged where the officer told Evans he was not going to issue citation within the first four

minutes, but made Evans wait an additional eight minutes until the results from the secondary check returned. *Evans*, 786 F.3d at 786. Because Evans' wait doubled the length of time necessary to complete the traffic mission, the Ninth Circuit concluded the stop was prolonged. *Id.* On the other hand, in *Mendez*, the Ninth Circuit rejected the argument that the officer did not diligently process the traffic citation because of a delay in his processing the paper work. *Mendez*, 476 F.3d at 1079–80. The court concluded that the delay could have been attributed to an initial belief that the license and registration checks were not necessary. *Id.*

Here, the Court agrees with Brooks that the traffic stop was prolonged by the investigation. First, as Brooks points out, Trooper Moore asked the same series of questions many times, circling back to confirm Brooks' answers remained consistent. Trooper Moore asked Brooks where he was coming from within two minutes of initiating the stop. Once in the patrol car, Trooper Moore asked the same question approximately five minutes later. Approximately two minutes after that, Trooper Moore asked the question for a third time, this time wanting to know where Brooks had stayed and how long he had visited. (Doc. 28 at 5–7.)

The Government argues that the questioning associated with the criminal investigation did not delay the traffic stop because the questions served a dual,

simultaneous purpose, related to both the traffic mission and the criminal investigation. While the Court agrees that much of the questioning falls into the dual purpose category, including Trooper Moore's questions designed to determine how long Brooks had driven, whether Brooks might be impaired, whether he was in a hurry, and the general itinerary of the trip, some of Trooper Moore's questions do not fall into this category. For example, Trooper Moore's questions regarding the role Brooks played in the wedding and his questions regarding the whereabouts of Brooks' wife are unrelated to the traffic mission. While the criminal investigation did not add time after completion of the traffic mission as in *Evans*, it is evident that but-for the additional time taken to question Brooks *multiple times* regarding the unrelated details of his travel, and review the results from the unrelated records checks, the encounter would have terminated sooner. Accordingly, the Court concludes that the extraneous investigation did in fact prolong the traffic stop.

Thus, the determinative question is whether Trooper Moore had an independent reasonable suspicion to prolong the traffic mission, and the Court concludes that he did.

## III.    Independent Reasonable Suspicion

"Reasonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences,

form a basis for particularized suspicion." *Evans*, 786 F.3d at 788 (quoting *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 200 (en banc) (internal quotation marks omitted). "The concept of reasonable suspicion, like probable cause, is not readily, or even usefully, reduced to a neat set of legal rules," *United States v. Sokolow*, 490 U.S. 1, 7 (1989), but is rather is intentionally abstract, as courts are instructed to give "due weight" to the factual inferences drawn by law enforcement officers. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *see also United States v. Hartz*, 458 F.3d 1011, 1017 (9th Cir. 2006) (finding that "[r]easonable suspicion exists if 'specific, articulable facts ... together with objective and reasonable inferences suggest that the persons detained by the police are engaged in criminal activity.''). This standard is not a high threshold. *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc).

The "particularized suspicion" requirement encompasses two elements. *Montero-Camargo*, 208 F.3d at 1129. "First, the assessment must be based upon the totality of the circumstances," and includes conduct that might be entirely "innocuous in isolation," but when taken in a broader context creates reasonable suspicion. *Id.* at 1129–30. Next, this "reasonable suspicion" must arouse the belief that the "the particular person being stopped has committed or is about to commit a crime." *Id.* at 1129. "Th[is] process does not deal with hard certainties, but with probabilities." *United States v. Cortez*, 449 U.S. 411, 417 (1981).

However, this determination requires more than "a mere hunch." *Valdes-Vega*, 738 F.3d at 1078 (citing *Arvizu*, 534 U.S. at 274).

In forming this reasonable suspicion calculus, courts are cautioned against considering factors that may be subjective. *See generally Montero-Camargo*, 208 F.3d 1122 (9th Cir. 2000). In *Montero-Camargo*, the Ninth Circuit instructed that the district court should not have considered the officers' interpretation that the passenger tried to hide by picking up a newspaper when she saw his approach. *Id.* at 1135–36. Reading significance into this fact created a "damned if you do, equally damned if you don't" situation for the passanger. *Id.* at 1136. The officer could just as easily have been suspicious if she had "paid too much, rather than too little attention." *Id.* at 1135–36. Similarly, a court can consider whether an individual made eye contact, but not that the eye contact appeared "suspicious." *Id.* at 1136.

Brooks points to a number of factors that he believes are subjective, including Trooper Moore's initial dislike of where Brooks parked his car and Trooper Moore's belief that Brooks used his body to shield the center console from view. Similarly, Brooks discredits Trooper Moore's assertion that Highway 191 is a known drug corridor.

The Government argues that Trooper Moore had reasonable suspicion when he observed Brooks turn right into the subdivision and park alongside the dirt

berm. Trooper Moore testifies that this was the moment he believed something was not right. From there, his suspicion only increased in response to the following irregularities, including: (1) the vehicle pulled into unoccupied development, but had an out-of-state license plate; (2) as Trooper Moore approached the vehicle, the brake lights remained engaged, causing him to believe the driver might drive away or back over him; (3) Trooper Moore observed gross movements that he considered inconsistent with a person retrieving a license and registration; (4) Brooks' reluctance to roll down the window; (5) Brooks' wide-eyed, nervous look; (6) Trooper Moore's belief that Brooks was shielding the center console from view as he retrieved his license and registration; (7) Brooks' repeated glances in Trooper Moore's direction; and (8) the spent shell casing that Trooper Moore observed on the drivers' side floor of the vehicle.[3] (Doc. 38 at 13–14.)

In considering Trooper Moore's sworn testimony, the Court is mindful of its duty to consider only those factors which do not call for a subjective interpretation in the reasonable suspicion calculus, while giving "due weight" to the "factual inferences drawn by" Trooper Moore. *United States v. Arvizu*, 534 U.S. 266, 273

---

[3] Trooper Moore testified that he observed what appeared to be a spent shell casing. Later, the vehicle's search revealed that it was not in fact a spent shell casing, but live ammunition.

(2002). With this guidance in mind, the Court attaches no significance to Trooper Moore's impression that Brooks appeared wide-eyed and nervous, Brooks' repeated glances in Trooper Moore's direction and that Brooks appeared to use his body to shield the center console from view. These are the very sort of factors cautioned against in *Montero-Camargo*.

However, Trooper Moore testified that upon seeing Brooks turn right within the newly developed subdivision he sensed that something was not right. The Court agrees with Brooks that Trooper Moore's suspicion began as a "hunch" of criminal activity. However, this hunch ripened into something more through the accumulation of a series of independently innocent facts which taken together formed something more. The Court finds the following facts particularly significant to the reasonable suspicion calculous: (1) Trooper Moore's testimony that the brake lights remained on while he approached the vehicle; (2) the gross movements that Trooper Moore observed as he approached the vehicle; and perhaps most significantly, (3) Brooks' reluctance to roll down the window which occurred at the outset of the traffic stop. While this series of behaviors caused Trooper Moore to believe that something more was going on, his suspicion became particularized when Trooper Moore observed what appeared to be a spent shell casing on the driver's side floor of Brooks' vehicle, which had been rented

three days previously. Accordingly, the Court concludes that from this moment forward Trooper Moore had a particularized and reasonable suspicion to believe that Brooks was engaging in, or about to engage in, criminal activity. This suspicion authorized any reasonably prolonged investigation into matters unrelated to the traffic mission. Thus, because the Court concludes that independent reasonable suspicion occurred within seconds of Brooks stepping out of the vehicle, it is unnecessary to address how Trooper Moore's suspicion was further confirmed through the investigation that followed.

Accordingly, the Court DENIES Brooks' Motion to Suppress evidence. (Doc. 28.)

DATED this 4th day of January, 2018.

Dana L. Christensen, Chief Judge
United States District Court